**SO ORDERED.**

**SIGNED this 15 day of February, 2008.**



_____
JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| WILLIAM V. ALLEN and | ) | |
| DIANE R. ALLEN, | ) | Case No. 07-41327 |
| | ) | Chapter 13 |
| Debtors. | ) | |
| | ) | |

**MEMORANDUM ORDER AND OPINION OVERRULING TRUSTEE'S OBJECTION
TO CONFIRMATION OF DEBTORS' CHAPTER 13 PLAN**

This matter is before the Court on Trustee's Objection to Confirmation of Debtors' Chapter 13 Plan.[1] The Trustee has objected to confirmation of the amended plan on the basis that Debtors' means test calculations erroneously included the full amount of their pre-petition car payments, rather than the reduced or "crammed-down" amounts they propose to pay through their Chapter 13 plan. The Trustee contends that this improperly lowers the amount of funds available to pay unsecured creditors over the life of the plan. The parties have submitted both a Stipulation of Facts[2]

_____

[1] Doc. 20.

[2] Doc. 19.

and briefs, and the Court is now prepared to rule. The Court has jurisdiction to decide this matter,[3] and it is a core proceeding.[4]

I.     **FINDINGS OF FACT**

On February 21, 2006, William and Diane Allen (the "Debtors") entered into a Security Agreement with Wells Fargo Financial Kansas, Inc. ("Wells Fargo"). Pursuant to the promissory note between the parties ("Wells Fargo Note"), Debtors pledged an unencumbered 2003 Chevy Cavalier ("Wells Fargo Collateral") in exchange for the loan in the amount of $12,187.

On June 30, 2006, Debtors entered into a Security Agreement with CitiFinancial, Inc. ("CitiFinancial"). Pursuant to the promissory note between the parties ("CitiFinancial Note"), Debtors pledged an unencumbered 1997 Chevy Cavalier ("CitiFinancial Collateral") in exchange for the loan in the amount of $10,000.

Debtors filed their Chapter 13 petition on September 27, 2007. As of that date, Debtors owed approximately $11,239 on the Wells Fargo Note and the Wells Fargo Collateral had a NADA retail value of $6,325. On the CitiFinancial Note, Debtors owed approximately $12,855 and the CitiFinancial Collateral had a NADA retail value of $2,850.

Wells Fargo filed its Proof of Claim on November 6, 2007. In its claim, Wells Fargo stated that $10,064 was due on the Wells Fargo Note and valued the Wells Fargo Collateral at $6,325. CitiFinancial filed its Proof of Claim on November 30, 2007. In its claim, CitiFinancial did not state the dollar amount of its claim, but valued the CitiFinancial Collateral between $1,725 and $3,075.

---

[3] 28 U.S.C. § 1334.

[4] 28 U.S.C. § 157(b)(2).

Because neither the Wells Fargo Collateral nor the CitiFinancial Collateral were purchased with the loans provided by these creditors, neither lien constitutes a purchase money security interest. For that reason, Debtors have elected to "cram down" the claims of both Wells Fargo and CitiFinancial,[5] proposing to pay only the fair market value of their respective collateral through the plan in full satisfaction of each claim. Notwithstanding these plan terms, Debtors listed the full monthly payments based on the estimated claims of Wells Fargo and CitiFinancial on lines 47(b) and 47(c) of Form 22C, not the lesser amounts the plan proposes to pay for those vehicles based on value.

The Trustee contends that Debtors should have instead listed on lines 47(b) and 47(c) the average monthly payments Debtors will actually make to the secured creditors if the plan is confirmed. Because Debtors did not list the lower cram down amounts on lines 47(b) and 47(c), Trustee alleges that Debtors have underestimated their true projected disposable income and, as such, that the Court must decline to confirm the plan in accordance with 11 U.S.C. § 1325.

## II. RELEVANT STATUTES

Pursuant to 11 U.S.C. § 1325(b)(1),[6]

---

[5] Because these loans do not constitute purchase money obligations, they do not fall within the provisions of the hanging paragraph in § 1325(a). *See In re Vega*, 344 B.R. 616, 621 (Bankr. D. Kan. 2006) for an explanation of the hanging paragraph in § 1325(a) and its effect on a debtor's ability to "cram down" the value of an automobile in a Chapter 13 plan.

[6] This case was filed after October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") became effective. All future statutory references are thus to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 11 U.S.C. §§ 101-1532 (2005), unless otherwise specifically noted. Any reference to the Bankruptcy Code as it existed prior to the 2005 amendments will be referred to as 11 U.S.C. § ___ (2004) or to "Pre-BAPCPA § ___."

3

> [i]f the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan–
>
>> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>>
>> (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

"Disposable income" is defined in § 1325(b)(2) as follows:

> For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended–
>
>> (A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and
>>
>> (ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and
>>
>> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

Pursuant to § 101(10A), "current monthly income"

> (A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on–
>
>> (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

4

(ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and

(B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent), but excludes benefits received under the Social Security Act, payments to victims of war crimes or crimes against humanity on account of their status as victims of such crimes, and payments to victims of international terrorism (as defined in section 2331 of title 18) or domestic terrorism (as defined in section 2331 of title 18) on account of their status as victims of such terrorism.

Finally, § 1325(b)(3) instructs that for an above-median debtor,[7] the "amounts reasonably necessary to be expended under paragraph (2)," which defines disposable income, "shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)." Section 707(b)(2)(A) allows debtors to deduct certain expenses relating to secured debts as follows:

(iii) The debtor's average monthly payments on account of secured debts shall be calculated as the sum of–

(I) the total of all amounts *scheduled as contractually due* to secured creditors in each month of the 60 months following the date of the petition; and

(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;

divided by 60.[8]

---

[7]Section 1325(b)(3) does not actually use the term "above-median debtor," but courts have generally adopted that term to refer to debtors who, under §§ 1325(b)(3)(A), (B) and (C) have current monthly income, multiplied by twelve, that is greater than the median family income of families of a similar size in the state in which the debtors reside.

[8]Emphasis added.

5

## III. ANALYSIS

At issue in this case is whether Debtors are entitled to use the full amount of the payments due Wells Fargo and CitiFinancial under the contractual agreements with those secured creditors, notwithstanding their stated intent to cram down those payments in their Chapter 13 plan, or if the term "scheduled as contractually due" found in § 707(b)(2)(A)(iii) instead requires Debtors to only list the amount they will actually pay through their plan, if confirmed. There is a clear split among the courts that have decided this issue; neither the Tenth Circuit Court of Appeals nor the Tenth Circuit Bankruptcy Appellate Panel have had the opportunity to decide the issue.

Some courts conclude that "scheduled" refers to a debtor's obligation to make payments in the future under its pre-petition contract with the lender. These courts conclude that debtors may deduct the full amount of their secured debt on Form 22C, irrespective of any future intent to pay a lesser amount through their Chapter 13 plan, or no amount at all in the case of an intent to surrender the collateral. Other courts, however, conclude that "scheduled" refers to the debtor's bankruptcy schedule. These courts hold that debtors who intend to surrender collateral securing a claim may not deduct the full amount of their pre-bankruptcy secured obligation, divided by 60, because such payments will no longer be "scheduled as contractually due" after the plan is confirmed.[9]

---

[9] A third line of cases, led by *In re Singletary*, 354 B.R. 455 (Bankr. S.D. Tex. 2006), has also emerged in connection with the appropriate deduction for collateral that is to be surrendered. This line of cases differentiates between cases where the collateral has been surrendered pre-petition and cases where the debtors state their intent to surrender the property, but have not yet done so. This line of cases is inapplicable under the facts before this Court, where Debtors are not proposing to surrender the collateral at all, but instead have opted to retain the property but pay for it at a reduced cost based upon the actual value of the property rather than the amount currently owed the creditor.

6

Although these Debtors intend to "cram down" the value of the collateral through their Chapter 13 plan rather than surrender the collateral securing their debt, the rationale and conclusions drawn from surrender cases apply with equal force to the current facts. As such, the Court finds an analysis of the two theories, and the respective leading cases adopting each theory, instructive.

> A. **Analysis by courts concluding that "scheduled as contractually due" means payments to secured creditors scheduled to occur post-petition.**

Those courts applying the majority approach, following the reasoning first espoused by the court in *In re Walker*,[10] conclude that "scheduled as contractually due" refers to "payments owed under a contract at the time of filing of the petition, whether or not they are actually paid."[11] As statutory canons of construction require, the *Walker* court began its analysis by looking at the plain meaning of § 707(b)(2)(A)(iii). In doing so, the court determined that

> [t]he common meaning of "as contractually due" is that the debtor is legally obligated under the contract, in this case, a promissory note, to make a payment in a certain amount, with a certain amount of interest, for a set number of months into the future. Accordingly, payments that are "scheduled as contractually due" are those payments that the debtor will be required to make on certain dates in the future under the contract.[12]

---

[10] 2006 WL 1314125 (Bankr. N.D. Ga. 2006).

[11] *In re Lindstrom*, --- B.R. --- 2007 WL 4790790 *1 (Bankr. D. Colo. 2007). Courts following *Walker* include: *In re Makres*, 380 B.R. 30 (Bankr. N.D. Okla 2007); *In re Bendetti*, 372 B.R. 90 (Bankr. D.S. Fla. 2007); *In re Kelvie*, 372 B.R. 56 (Bankr. D. Idaho 2007); *In re Wilkins*, 370 B.R. 815 (Bankr. C.D. Cal. 2007); *In re Palm*, 2007 WL 1772174 (Bankr. D. Kan. 2007); *In re Kogler*, 368 B.R. 785 (Bankr. E.D. Wis. 2007); *In re Galyon*, 366 B.R. 164 (Bankr. W.D. Okla. 2007); *In re Longo*, 364 B.R. 161 (Bankr. D. Conn. 2007); *In re Mundy*, 363 B.R. 407 (Bankr. M.D. Pa. 2007); *In re Hartwick*, 359 B.R. 16 (Bankr. D.N.H. 2007); *In re Randle*, 358 B.R. 360 (Bankr. N.D. Ill 2006); *In re Nockerts*, 357 B.R. 497 (Bankr. E.D. Wis. 2006); and *In re Simmons*, 357 B.R. 480 (Bankr. N.D. Ohio 2006).

[12] *Walker*, 2006 WL 1314125 *3.

7

The trustee urged the *Walker* court to take into account the debtor's future intent to surrender the collateral because, according to the trustee, when the debtor did so surrender the collateral the payments on it would no longer be "scheduled as contractually due." The court, in declining to make such a finding,[13] stated:

> Congress' choice of the phrase, "scheduled as contractually due," suggests that, in determining which payments should be averaged for the deduction, the Court should determine how many payments are owed under the contract for each secured debt at the time of filing. This interpretation gives meaning to the word *"scheduled," which implies the possibility that the payments may not be made as required under the contract*, either because the debtor will surrender the collateral or *because the payments might be modified and paid through a Chapter 13 plan.* If the intent were to permit only those payments that would actually be made in the post-petition period, Congress could have specified that the payments to be deducted are only those payments to be made on secured debts that the debtor intends to reaffirm.[14]

*Walker* also reasoned that

> [t]he use of the phrase "contractually due" also indicates an intent to permit a deduction for all secured debts, regardless of whether the debt is reaffirmed or the collateral is surrendered. The surrender of the collateral does not change the fact that the payments are "contractually due." When a debtor files the bankruptcy petition, the debtor is contractually due for payments on the outstanding secured debts for the length of the contract. The debtor's contractual liability for the debt is not eliminated upon the surrender of the collateral. At the earliest, it may be eliminated by the entry of the discharge. At the latest, the contractual obligation may never actually be eliminated, but instead, the creditor would merely be enjoined from collecting the debt from the debtor *in personam.* In other words, nothing the debtor does or does not do changes the fact that scheduled payments remain contractually due.[15]

Moreover, the court pointed out that this reading of the statute was in accordance with the structure of the means test itself. The means test is a snapshot—"a backward looking test, which is designed to measure the debtor's financial health at the time of the filing and to determine whether

---

[13]*Id.*

[14]*Id.* at *4 (emphasis added).

[15]*Id.*

8

the debtor is in need of bankruptcy relief."[16]  Conversely, the trustee's reading of "scheduled as contractually due," the *Walker* court reasoned, would frustrate the structure of the means test by requiring the court to conduct a forward-looking analysis, taking into consideration remedies "which would not be available outside of bankruptcy[] to determine whether the debtor should be entitled to such relief in the first place."[17]

Finally, although the court acknowledged the trustee's calculation had appeal because it more accurately reflected the debtor's post-petition financial ability to repay creditors through a Chapter 13 plan, the court found that any such appeal was insufficient to overcome the plain language of the statute.[18]  As the court noted:

> It is true that the U.S. Trustee's method of completing the Debtors' Form B22 would more accurately ascertain the debtor's post-petition financial condition.  However, section 707(b)'s presumption of abuse was not intended to and does not produce the most accurate prediction of the debtor's actual ability to fund a Chapter 13 plan . . . . The means test is, after all, a mechanical estimate of the debtor's abilities to fund a Chapter 13 plan and was not intended to be a perfect indicator of ability to pay. The Court cannot ignore the plain language of the statute . . . simply because [it is] inconsistent with reality.[19]

The Supreme Court has clearly instructed bankruptcy courts to not consider whether particular phraseology makes good policy sense, to the extent a court can ascertain policy, but instead to apply the statute as written, leaving it to Congress to amend the statute if a contrary interpretation was intended.[20]

---

[16]*Id.* at *5.

[17]*Id.*

[18]*Id.* at *6.

[19]*Id.*

[20]*See Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004).

Another persuasive argument against reading the phrase "scheduled as contractually due" to refer to the bankruptcy schedules themselves was made by the court in *In re Nockerts*.[21] In *Nockerts*, the court noted that Congress had used the word "scheduled" in two instances where the Bankruptcy Code clearly intended the word to mean "listed on the bankruptcy schedules"— § 523(a)(3) (discharge of a debt that is "neither listed nor scheduled under section 521(1)") and § 544(c) (deemed abandonment of property "scheduled under section 521(1)"). The Code contains two other instances where the word "scheduled" clearly does not mean "listed on the bankruptcy schedules"— § 524(k)(3)(H)(ii) (suggested reaffirmation agreement language "describing the repayment schedule with the number, amount, and due dates or period of payments scheduled to repay the debts reaffirmed to the extent then known by the disclosing party"); and § 1326(a)(1)(B) (debtor shall make pre-confirmation payments "scheduled in a lease of personal property directly to the lessor").[22] As noted by the court in *Nockerts*,

> [t]his exercise in statutory analysis compels the conclusion that "scheduled as contractually due" does not refer to the bankruptcy schedules. When describing the bankruptcy schedules, Congress included in the statute a reference to the schedules, either directly by name or indirectly by reference to § 521, the provision that requires the debtor to file bankruptcy schedules. On the other hand, when the statute refers to scheduled payments, such as in the reaffirmation or pre-confirmation lease provision, the bankruptcy schedules are not mentioned.[23]

---

[21]357 B.R. 497 (Bankr. E.D. Wis. 2006).

[22]*Id*. at 502.

[23]*Id*. *See also In re Randle*, 358 B.R. 350, 365 (noting "There is no bankruptcy schedule that requires the debtor to list 'all amounts contractually due to secured creditors in each month of the 60 months following the date of the petition.' So there is no bankruptcy schedule to which § 707(b)(2)(A)(iii) could refer.").

10

In this case, Congress made no reference, either directly or indirectly, to the bankruptcy schedules, lending further support for the proposition that Congress did not intend the term "scheduled as contractually due" to mean items as listed in the debtor's bankruptcy schedules.

      B.     **Analysis of courts concluding that "scheduled as contractually due" means items found on the debtor's bankruptcy schedules.**

The minority of courts applying the contrary view follow the reasoning first espoused by the court in *In re Skaggs*.[24] That court concluded that a debtor's "schedules and statements form the basis from which the Court should determine whether a debt is 'scheduled as contractually due.'"[25]

In *Skaggs*, the court criticized the *Walker* court's use of a "dictionary definition" of "scheduled" to reach its conclusion that "scheduled as contractually due" referred to payments to secured creditors contractually scheduled to occur post-petition.[26] The *Skaggs* court reasoned that because "Congress used the phrase 'scheduled as' several times in the Bankruptcy Code to refer not to the common dictionary meaning of the word schedule (i.e., 'to plan for a certain date'), but to whether a debt is identified on a debtor's bankruptcy schedules," the use of the word "scheduled" in § 707(b)(2)(A)(iii) must also refer to whether a debt is identified on a debtor's bankruptcy schedules.[27] After all, the court noted,

> [w]hen Congress amends a law, as it did with BAPCPA, the prior statute's ". . . longstanding meaning forms the background against which Congress legislates . . .

---

[24]349 B.R. 594 (Bankr. E.D. Mo. 2006). Courts following *Skaggs* include: *In re Naut*, 2008 WL 191297 (Bankr. E.D. Pa. 2008); *In re Burden*, 380 B.R. 194 (Bankr. W.D. Mo. 2007); *In re Ray*, 362 B.R. 680 (Bankr. D.S.C. 2007); and *In re Harris*, 353 B.R. 304 (Bankr. E.D. Okla. 2006).

[25]*Skaggs*, 349 B.R. at 599.

[26]*Id*

[27]*Id.*

. The courts presume that Congress will use clear language if it intends to alter an established understanding about what a law means; if Congress fails to do so, courts presume that the new statute has the same effect as the older version."[28]

Therefore, because nothing in § 707(b)(2)(A)(iii) indicates Congressional intent to assign a different meaning to "scheduled," the court argued that to assign a different meaning "would run contrary to the statute."[29] Moreover, the court concluded that this interpretation best ensures that those debtors who could actually afford to pay their debts do so—admittedly a primary goal of Congress in passing BAPCPA.[30]

### C. "Scheduled as contractually due" means payments to secured creditors scheduled to occur post-petition.

Although this Court agrees that a forward-looking approach would better reflect a debtor's actual ability to pay his or her debts, and that such interpretation would more likely ensure that debtors who can pay something to their unsecured creditors are required to do so, the Court cannot ignore the plain language of § 707(b)(2)(A)(ii) to reach that result. Accordingly, this Court will follow *Walker* and its progeny in holding that the means test is a snapshot in time, meant to assess a debtor's financial status as of the date the petition is filed.[31] The Court finds the reasoning of

---

[28]*Id.* (quoting *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 988 (7th Cir. 2001) (citing *Cottage Svgs. Ass'n v. Commissioner*, 499 U.S. 554, 562 (1991)).

[29]*Id.*

[30]*Id.* at 600.

[31]This Court has previously held that when considering the income side of the means test, it is required to "consider at confirmation the debtor's actual income as reported on Schedule I (Official Form 6I, revised 10/06), as well as any reasonably anticipated changes in that income during the life of the proposed Chapter 13 plan." *In re Lanning*, 2007 WL 1451999 (Bankr. D. Kan. 2007). That decision was based, in large part, upon the Court's finding that the phrase "projected disposable income" was intended to be a forward-looking concept—focusing largely on the addition of the word "projected" to modify the separately defined term "disposable income." The Court secondarily noted in that case that a contrary holding would have deprived

*Walker* more persuasive and applies it to this case to overrule Trustee's objection. Debtors' plan will be confirmed.

The approach taken by *Walker*, and the cases that follow it, gives a more consistent reading of the term "scheduled" when compared with that term's use in other sections of the Bankruptcy Code and provides logical meaning to the words "contractually due." This holding also furthers the concept that the means test is intended to be snapshot look at a debtor's financial status, except when clearly provided otherwise, for example when Congress inserts a forward-looking term, such as "projected," in the statute. Finally, in following *Walker*, this Court joins Judge Berger's *In re Palm*[32] decision, which also found the *Walker* analysis more persuasive.

## IV. CONCLUSION

The Court finds that Debtors are not limited to a deduction of their "crammed down" monthly payment on collateral, and instead may deduct on line 47 of Form 22C the full amount of the pre-bankruptcy contractual payments due to Wells Fargo and CitiFinancial (divided by 60).

---

that debtor, whose income had precipitously dropped immediately before she filed bankruptcy, of seeking relief, counterintuitive to the Congressional scheme. When looking at the statutory language dealing with the expense side of the means test equation, however, § 707(b)(2)(A)(iii)(I) does not require (or allow) the Court to look to the "projected" amounts due to secured creditors in the future, as was the case with "projected disposable income," but instead provides that the average monthly payments "shall" be "the total of all amounts scheduled as contractually due . . . ." Had Congress inserted a qualifier such as "projected" into the expense side of the means test, the outcome of this case would likely be different.

[32]*In re Palm*, 2007 WL 1772174 *3 (finding that "[b]ased on a plain reading of the statute, 'scheduled as contractually due' means the payments owed to secured creditors under contract as of the petition date.'").

13

These amounts were "scheduled as contractually due" in accordance with § 707(b)(2)(A)(iii) and, as such, Trustee's Objection to Confirmation of Debtors' Chapter 13 must be overruled.[33]

**IT IS, THEREFORE, BY THIS COURT ORDERED** that Trustee's Objection to Confirmation of Debtor's Chapter 13 Plan is overruled and Debtors' Chapter 13 plan is confirmed. The Trustee shall submit the appropriate Order Confirming Plan to the Court for approval.

###

---

[33] Although not directly relevant to the outcome of this case, the Court notes that the recent enactment of 28 U.S.C. § 158(b)(2), which allows for the direct appeal of bankruptcy court decisions to the appropriate Circuit Court of Appeals, seems ready-made for decisions like this one. This case clearly involves "a question of law as to which there is no controlling decision of the court of appeals for the circuit or the Supreme Court of the United States" and the opinion "involves a question of law requiring resolution of conflicting decisions." 28 U.S.C. § 158(d)(2)(A)(I) and (ii). If the Trustee elects to appeal this decision, which this Court frankly encourages to resolve a conflict within this Circuit, the prolonged time period during which the appeal would otherwise wind its way through either the Tenth Circuit Bankruptcy Appellate Panel or the United States District Court for the District of Kansas before reaching the Tenth Circuit Court of Appeals could potentially cause Debtors' plan to fail, in the event this Court's decision was reversed, because there could be too few remaining months for Debtors to propose and pay a plan that would require a considerably higher payment to unsecured creditors.

14